PEARSON, J.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | CASE NO. 1:13-CR-00467-1 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE BENITA Y. PEARSON |
| ) | |
| DARNELL NASH, ) | |
| ) | **ORDER** |
| Defendant. ) | [Resolving ECF No. 309] |

Pending is Defendant Darnell Nash's Motion to Reduce Sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) (Non-COVID). ECF No. 309. The Government responded in opposition. ECF No. 318. Defendant replied. ECF No. 322. Defendant filed a supplement (ECF No. 324) and the Government responded in opposition (ECF No. 326). Defendant also filed two *pro se* supplements. ECF Nos. 328-1, 331.[1] For the reasons that follow, Defendant's motion is denied.

## I. Background

Defendant pled guilty to thirty-three charges resulting from Defendant and several accomplices conspiring to and filing fraudulent claims for unemployment insurance in at least six states. Defendant was the leader and, to facilitate the criminal scheme, registered as a fake employer in the states defrauded. Claiming to offer financial assistance to residents of low-income neighborhoods, Defendant and her co-conspirators distributed flyers, purporting to offer the residents financial help. When residents called the number on the flyers, however, one of the

---

[1] The Court did not require the Government to respond to Defendant's *pro se* supplement (ECF No. 328-1) and will give both supplements the consideration required. *See* Order, ECF No. 329.

(1:13CR467-1)

conspirators, using a script credited to Defendant, asked for the callers' names, dates of birth, and Social Security numbers. The conspirators then used that information to make fraudulent applications for unemployment benefits which Defendant and her co-conspirators used for their own purposes.[2] Defendant obtained over $361,000 through this scheme.

      While perpetuating the criminal scheme for which she is incarcerated and before, Defendant was transient. She rented apartments and hotel rooms and traveled to different states while working as an escort. Despite her age, at sentencing—30, she had no history of legitimate employment. Her defense counsel blamed her lack of employment on "her appearance" (ECF No. 110 at PageID #: 638), and claimed that her "status as a transgender individual also made it difficult for her to obtain and maintain gainful employment." ECF No. 110 at PageID #: 638. At the time of her sentencing, she was estranged from her family and believed that no one knew her well enough to provide collateral information to the probation officer preparing the presentence report. She claimed no income or assets apart from the cash and debit cards linked to her crimes and had significant debt due to unpaid medical bills and rent of approximately $2,000 per month. *See* Presentence Report, ECF 104 *SEALED* at PageID #: 598, ¶ 80. The presentence report revealed, without objection, that Defendant and a co-defendant used proceeds of the fraud to buy a Land Rover valued at approximately $35,000.

      Defendant's criminal history is replete with fraud offenses, dating back to when she was a juvenile, and includes an illegal weapon conviction as well as one for operating a vehicle in a manner that put others at substantial risk of serious physical harm.

---

    [2] Defendant's guidelines calculation was increased by four levels because she victimized vulnerable members of the public.

2

(1:13CR467-1)

The sentencing judge imposed a 175-month term of incarceration and ordered Defendant to pay $361,341 in restitution.[3]  When released, Defendant will serve three years of supervised release with conditions.[4]  ECF No. 114 at PageID #: 697.

The appellate court affirmed Defendant's sentence.  ECF No. 128; *United States v. Nash*, 648 F. App'x 589 (6th Cir. 2016).  Since then, Defendant has filed many motions, both *pro se* and by counsel, seeking sentence reduction.  A different panel of the appellate court ordered that her request be reassigned, after finding that the sentencing judge had not appropriately considered Defendant's new allegations of rape and seemed to have decided that "no amount of sexual violence—no matter how severe or frequent—could justify compassionate release'".[5]  ECF No. 299 at PageID #: 1791.  *Cf.* ECF No. 299 at PageID #: 1794 (Siler, J., dissenting) (finding that "the original district judge is best qualified to review the case and take such other action as may be proper under the law").

---

[3] One of the thirty-three charges, aggravated identity theft, required a mandatory minimum two-year term of imprisonment consecutive to any other term of imprisonment. The advisory guidelines *suggested* 151 to 188 months of imprisonment for all other charges.  Ultimately, the sentencing judge imposed 120 months concurrent to 151 months and consecutive to 24 months, for a total of 175 months of incarceration, and ordered Defendant to pay $361,341 in restitution.  When released, Defendant will serve three years of supervised release with conditions.  ECF No. 114 at PageID #: 697.

[4] Defendant is incarcerated at USP Coleman II with an anticipated release date of July 31, 2027.  *See Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Aug. 15, 2025).

[5] The Sixth Circuit's finding that "[t]his is not a case with a complex factual record" and that "[a] different judge will have no trouble familiarizing [themself] with the facts underlying [Nash's] compassionate-release motion," could not be further from reality. ECF No. 299 at PageID #: 1793; *United States v. Nash*, No. 23-3635, 2024 WL 1979067, at *4 (6th Cir. Apr. 30, 2024).  The procedural history is tortuous and the salient facts, including, but not limited to, the number of sexual assaults Defendant alleges are not static. *See, e.g*, ECF No. 266 at PageID #: 1599 (alleging 136 sexual assaults); ECF No. 328-1 (alleging over 200 sexual assaults); ECF No. 331 (also alleging over 200 sexual assaults).

3

(1:13CR467-1)

The lengthy docket in this case reveals that Defendant has gender dysphoria, in addition to other mental health diagnoses. Her sex change was interrupted due to her being in and out of jail for much of her life. She has not yet had a penectomy and vaginoplasty, so the Bureau of Prisons houses her in facilities for men. *See infra,* Executive Order No. 14168, Sec.§ 4(a), 90 Fed. Reg. 8615, 8616–8617 (Jan. 30, 2025). She has self-mutilated and attempted suicide. Defendant claims that she has been sexually assaulted over 200 times while in BOP custody. *See* Suppls., ECF No. 328-1; ECF No. 331.

## II.     Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), a court may reduce a defendant's sentence upon motion of the Director of the Bureau of Prisons or the defendant. The Sixth Circuit instructs that district courts must follow a "three-step test" to determine whether to grant a defendant's motion for compassionate release. *United States v. Jones*, 980 F.3d 1098 (6th Cir. 2020).

> At step one, a court must "find[ ]" whether "extraordinary and compelling reasons warrant" a sentence reduction. At step two, a court must "find[ ]" whether "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Commission's policy statement on compassionate release resides in U.S.S.G. § 1B1.13. Thus, if § 1B1.13 is still "applicable," courts must "follow the Commission's instructions in [§ 1B1.13] to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized. At step three, "§ 3582(c)[(1)(A)] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case."

*Id.* at 1107–08 (alterations and emphasis in original) (citations omitted). When considering a motion for compassionate release, "district courts may deny compassionate release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to

4

(1:13CR467-1)

address the others"[6] but must "address all three steps" if granting such a motion. *United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021).

The Sentencing Commission amended the policy statement in § 1B1.13 to address motions filed by adults in custody. *See* U.S.S.G. § 1B1.13 (2023). As a result, courts deciding motions filed by prisoners after November 1, 2023, must consider § 1B1.13 in their analysis. *United States v. Whitworth*, No. 1:23CR0561-4, 2023 WL 8190131, at *2 (N.D. Ohio Nov. 27, 2023) (stating "[a] new United States Sentencing Commission policy statement now applies to 18 U.S.C. § 3582(c)(1)(A) motions brought by inmates after November 1, 2023."); *United States v. Harris*, No. 23-5187, 2023 WL 10294625, at *2 (6th Cir. Dec. 4, 2023) (considering the updated policy statement).

As amended, § 1B1.13(b) states that "[e]xtraordinary and compelling reasons exist under any of the following circumstances or a combination thereof," and discusses when the medical circumstances of the defendant, the age of the defendant, the family circumstances of the defendant, the defendant's victimization in custody, and other reasons may constitute extraordinary circumstances. U.S.S.G. § 1B1.13(b)(1)–(5).

A defendant is eligible to seek compassionate release from a court after he has exhausted all administrative rights to appeal the BOP's failure to bring a motion on his behalf or thirty days have elapsed since requesting that the warden of his facility initiate such action. 18 U.S.C.

---

[6] *See United States v. Tomes*, 990 F.3d 500, 504 (6th Cir. 2021) ("[W]e can affirm a [district] court's denial of a defendant's compassionate release motion based on the [district] court's consideration of the § 3553(a) factors alone."), *cert. denied*, 142 S. Ct. 780 (2022). *United States v. Lemons*, 15 F.4th 747, 749 (6th Cir. 2021) ("[A] court must deny a defendant's motion if the defendant fails to show either that extraordinary and compelling reasons warrant a sentence reduction or that the § 3553(a) factors support a reduction.").

5

(1:13CR467-1)

§ 3582(c)(1)(A); United States v. Alam, 960 F.3d 831, 834 (6th Cir. 2020) ("Prisoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the appeals available to them.").

### III. Discussion

#### A. Exhaustion

By its count, the Government believes the motion at bar is Defendant's ninth motion for compassionate release and that she did not submit a request to the warden of the facility at which she was housed at least thirty days before filing. The Government states that Defendant's last request for compassionate release was made on April 12, 2023, and administratively supported a different motion—her fifth *pro se* motion for compassionate release. *See* Resp. in Opp'n, ECF No. 318 at PageID #: 1887. The Government claims that as of October 9, 2024, "USP Tucson had no record of receiving a request for compassionate release from Defendant." ECF No. 318 at PageID #: 1887. In opposition, Defendant argues that "there is no authority to support the argument that [Defendant] must refile her request with every new warden at every institution when she is transferred." ECF No. 322 at PageID #: 2308. Defendant further states that there is an "emerging consensus" that a "transfer between facilities does not nullify the defendant's exhaustion of administrative remedies when the defendant filed a request for compassionate release with the warden at a previous facility." ECF No. 322 at PageID #: 2309.

The Court is persuaded that Defendant has exhausted her administrative remedies. The Government and Defendant agree that Defendant requested compassionate release on April 12, 2023[7] and received no response within 30 days. The instant motion was filed (by defense

---

[7] Defendant also claims to have requested that the warden release her on August 6, 2023. *See* ECF 299 at PageID #: 1790. She was declined or received no response.

6

(1:13CR467-1)

counsel in July 2024, ECF No. 309 dated 07/03/2024) following the Sixth Circuit's *vacatur* of the court's dismissal of Defendant's *pro se* May 2023 motion (ECF No. 279).[8] Because the instant motion addresses the unresolved merits of her May 2023 motion and Defendant had exhausted her administrative remedies prior to filing that motion, the Court finds that Defendant has exhausted her administrative remedies for the purposes of the current motion.

### B. Extraordinary and Compelling Circumstances

Defendant relies on two provisions—victim of abuse and the catchall or "other reasons" provision under § 1B1.13(b)(5).[9] The Court finds that Defendant satisfies the "other reasons" provision.

1. *§ 1B1.13(b)(4)*

§ 1B1.13(b)(4) requires the abuse result in "a conviction," but does not specify who must have been convicted. There is no dispute that Defendant has not presented a person convicted or found civilly liable for assaulting her while she has been in BOP custody.[10] She has, however,

---

[8] Defendant's request to the warden made in April 2023 exhausted the administrative remedies for Defendant's *pro se* motion (ECF No. 279) filed in May 2023. That motion was dismissed (ECF No. 284) by her former judge; and the Sixth Circuit vacated the dismissal (ECF No. 299) and reassigned the case. The motion at bar is derivative of that dismissed motion. Before the instant motion, Defendant filed a *pro se* motion (ECF No. 307) which the undersigned denied due to Defendant filing *pro se* while represented by counsel. ECF No. 315. The Court has also considered Defendant's requests to staff for compassionate release and notes that the validity of these documents are questionable due to the lack of signature indicating they were received by prison staff. *See* ECF No. 287-1 (Defendant dated 06/06/2023 but lacking signature); ECF No. 295-1 (Defendant dated 01/25/2024 but lacking signature).

[9] Defendant also requests the Court hold an evidentiary hearing if it finds there is a factual dispute on extraordinary and compelling circumstances. ECF No. 322 at PageID #: 2311. Because the Court does find that there are extraordinary and compelling circumstances, the Court does not see the need for an evidentiary hearing.

[10] Defendant points to two officers for incidents by prison officials, Officer Legins and Officer White. ECF No. 322 at PageID ##: 2311–12 (arguing that Defendant submitted evidence for the criminal conviction of Officer Legins); ECF No. 331 at PageID #: 2376

7

(1:13CR467-1)

presented evidence that she presented collateral evidence in a criminal case that resulted in the conviction of an officer who was charged with sexually assaulting a different inmate.[11] *See United States v. Legins*, Criminal No. 3:19CR104, 2020 WL 4092366 (E.D. Va. July 20, 2020). The Court need not discern whether "a conviction" means "any conviction" because Defendant meets the "other reasons" provision.

2. § 1B1.13(b)(5)

Defendant requests, in the alternative, that the Court find extraordinary and compelling circumstances under § 1B1.13(b)(5). Under this provision, Defendant alleges the "other acts evidence" from *Legins*, and "repeated sexual abuse" while in prison. ECF No. 322 at PageID ##: 2310–11.

Under § 1B1.13(b)(5), the Court is to consider "other circumstances or combination of circumstances" that are "similar in gravity to those described in paragraphs (1) through (4)." U.S.S.G. § 1B1.13(b)(5). The Sixth Circuit noted that it cannot be the case that "no amount of sexual violence—no matter how severe or frequent—could justify compassionate release." *See Nash*, No. 23-3635, 2024 WL 1979067, at *3 (concluding that "the [district] court did not engage in 'due consideration of the § 3553(a) factors' when rendering its decision."). The Federal Bureau of Prisons website also states that it has a "zero tolerance policy against sexual abuse" and that inmates have a "right against being pressured by anyone to engage in sexual acts and

---

(stating that Defendant had been sexually assaulted by Officer White and the incident was "cover[ed]-up").

[11] Defendant argues that *Legins* involved "other acts evidence," which purportedly included the sexual acts against Defendant and that such evidence was found "sufficiently reliable" by the court. ECF No. 322 at PageID ##: 2311–12; Mem. Order, ECF No. 41, *United States v. Legins*, Criminal No. 3:19CR104 (E.D. Va. Oct. 29, 2019).

8

(1:13CR467-1)

does not have to tolerate sexual abusive behavior or pressure to engage in unwanted sexual behavior from another inmate or staff member."[12]

### C. § 3553(a) Factors

When the Court considers a motion for sentence reduction, it must balance Defendant's offense conduct with circumstances that occurred post-incarceration.  While there is no agreement on the number of sexual assaults Defendant has suffered while incarcerated, there can be no reasonable disagreement that a single rape or sexual assault of an adult in custody is unacceptable and that such indignities are committed surreptitiously making them difficult to prove.[13]

Against this backdrop, Defendant argues that the "significant amount of time [she] has already served, the repeated abuse she has suffered and the substantial likelihood that she will continue to be assaulted while in prison, all weigh in favor of granting her motion for compassionate release."  ECF No. 322 at PageID #: 2313.  The Government retorts that the

---

[12] *See Sexual Abuse Prevention*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmates/custody_and_care/sexual_abuse_prevention.jsp (last visited July 28, 2025); Prison Rape Elimination Act ("PREA"), 28 C.F.R. § 115.

[13] Nevertheless, it must also be acknowledged that Defendant's history of fraud damages her credibility, so the Government's skepticism is understandable, especially given that Defendant is the sole keeper of the statistics regarding the number and nature of sexual assaults she has endured. *See, e.g.,* Resp. in Opp'n, ECF No. 318 at PageID #: 1888 (stating "Defendant produces no evidence to support her claim that she was sexually assaulted. . . . Defendant's medical records belie her claims."). *But see* Reply, ECF No. 322 at PageID #: 2310 (stating Defendants medical records "reflect a 'substantiated' sexual assault claim" and stating that noncompliance or lack of substantiation was due to BOP's failure to investigate).  The Court acknowledges that Defendant points to her medical record to show that incidents of sexual assault were reported on July 24, 2015, March 3, 2016, October 21, 2016, January 18, 2017, October 18, 2017, January 25, 2018, February 15, 2018, June 20, 2018, July 20, 2018, August 22, 2018, and January 28, 2019.  ECF No. 322 at PageID #: 2310 *and* Ex. B, Medical Records, ECF No. 319-2 *SEALED*.  Per Defendant's *pro se* supplements, she has been raped over 200 times.  ECF No. 328-1 at PageID #: 2363; ECF No. 331 at PageID #: 2377.

9

(1:13CR467-1)

nature and circumstances of the offense, Defendant's history and characteristics, her failure to show that she is not a danger to the community, and public interest considerations all weigh against Defendant's early release.

Considering all appropriate § 3553(a) factors, the Court finds that early release would undermine the seriousness of Defendant's crimes, put the public at unnecessary risk, and fail to deter Defendant's future criminal acts. Defendant's circumstances, or the combination of her circumstances, do not override the factors that encourage the Court to maintain the sentence imposed. For the reasons explained below, the Court does, however, modify her sentence to recommend that the Bureau of Prisons allows Defendant the maximum term of halfway house placement allowed pursuant to the Second Chance Act or other available funding. The Court also modifies her term of supervised release to include a six to nine months stay at a residential reentry center that can assist Defendant with obtaining and maintaining employment and provide stable housing upon her release.

1. *Nature and Circumstances of the Offense*

The Court is not impressed by Defendant's emphasis that her crimes were not violent.[14] Defendant's crimes were not victimless. And while her crimes do not minimize her sexual assaults, it must be acknowledged that, when free to do so, Defendant preyed on the vulnerable. The Sentencing Commission guides courts to "increase the severity of punishment for white-collar crime" and "require certain terms of confinement for many white-collar offenders." Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 HOFSTRA L. REV. L., 20 (Fall 1988); S. REP. 98-225, at 77, 92 (1983) (noting that

---

[14] *See* ECF No. 309 at PageID #: 1863 ("Although [Defendant] recognizes that her offenses caused harm to the community, her offenses were not violent in nature.").

10

(1:13CR467-1)

"particularly white-collar offenders and serious violent crime offenders, frequently do not receive sentences that reflect the seriousness of their offenses," and that probation may be "grossly inappropriate [ ] in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact").

Defendant's leadership role and use of complex schemes to commit crimes that victimized the vulnerable weigh against her release. As noted above, "[D]efendant was an organizer or leader and the criminal activity involved five or more participants or was otherwise extensive." *See* Final Presentence Report, ECF No. 104 *SEALED* at PageID #: 585. The co-defendants and others "working under [Defendant's] direction and control" and "read[ing] from a prepared script provided by [Defendant]" committed fraud and identity theft. *See* Tr. of Change of Plea Hr'g, ECF No. 127 at PageID #: 784. Defendant created a fraudulent organization, wrote the scripts to assist in collecting victims' information, organized and orchestrated management of phone lines, and maintained control of the unlawfully obtained government benefit cards. ECF No. 104 *SEALED* at PageID #: 583; Tr. of Sent'g Proc., ECF No. 126 at PageID #: 744–45.

The number of victims, their vulnerability and the geographic breadth of Defendant's crimes demonstrate the seriousness of the offenses. The U.S. Senate has recognized that "while the perpetrator of a fraud may be convicted upon the testimony of one or two victims, the vast majority of those who have suffered from [her] offenses are not as readily identifiable because their potential claims remain unsatisfied for want of knowledge." S. REP. 98-225, at 84 (1983). In Defendant's case, more than 50 individuals whose identities were stolen, six state departments who are owed restitution, and approximately 100 victims and their personal identifying

11

(1:13CR467-1)

information that Defendant purchased were identified.[15] Furthermore, the long and often unending "domino effects" of identity theft are well researched. *See Identity Theft: The Aftermath 2017*, IDENTITY THEFT RESOURCE CENTER, at 4. A survey found that one year after initial contact[16] to the Center, victims' financial, employment, housing, medical, and emotional wellbeing were often still affected. *Id.* at 8–12. While some victims resolved their matter in under six months, the majority stated that their identity theft issue was "not yet cleared." *Id.*, at 13 (charting that in 2016, 16.8% said the matter was resolved in under six months, 6.5% in seven to twelve months, 1.9% in twelve to eighteen months, 1.9% in eighteen to twenty-three months, 2.6% in two to five years, 2.6% more than five years, and 61.9% that it was not yet cleared). The research is clear that while fraud and identity theft might not be violent in nature, they are a danger to the community and have far reaching consequences for the victims and the community at large.

2. *History and Characteristics*

Defendant's extensive criminal history also weighs against her early release.[17] Defendant has violent juvenile offenses, "prolific, consistent" theft convictions, and was apprehended as a

---

[15] *See* Presentence Report, ECF No. 104 *SEALED* at PageID ##: 582–84; Tr. of Sent'g Proc., ECF No. 126 at PageID ##: 738–41 (applying Guideline enhancements for the number of victims and that the victims were of a vulnerable population).

[16] The survey population was 176 victims from 40 states and the District of Columbia. The report reflected the individuals who contacted the Center during the 2016 calendar year and the survey included questions about "victims' state of residence, their age when the crime began, their household income level, how they discovered the identity theft, and the amount of time between when the crime started and when they found out they were a victim." *Id.* at 6 (explaining the methodology of the survey).

[17] *See* Tr. of Sent'g Proc., ECF No. 126 at PageID ##: 757–60 (listing Defendant's criminal history and finding that "under 4A1.3(b) [the district court does not] think that [Defendant's] criminal history category overrepresents [Defendant's] criminal history category.").

12

(1:13CR467-1)

fugitive. The Government urges that Defendant "[does not] have any regard for the law, she [does not] respect the law, and her previous terms of incarceration do not seem to have had much, if any, deterrent effect." *See* ECF No. 126 at PageID ##: 746–47.

When expounding on her history of violence, the sentencing court found that Defendant had violence in her criminal history and that it was properly reflected in her criminal history category. The sentencing court pointed to defendant's delinquent adjudication for aggravated robbery, and that she had not been amenable to supervision. ECF No. 126 at PageID #: 757–58. Moving on to her adult criminal history, the sentencing court pointed to the facts of her offenses to show violence. Specifically, the court indicated that Defendant was the driver of a stolen vehicle from which witnesses indicated shooting came, and that Defendant had driven at a high rate of speed, lost control of the vehicle, and struck a telephone pole. ECF No. 126 at PageID #: 759. The court then indicated several failures to comply with police officers, and having a weapon under disability. ECF No. 126 at PageID #: 760. In total, the sentencing court found "a record of extraordinary violence, using a motor vehicle to flee and elude the police, and causing an accident when [Defendant was] running away from the police" which led to the court's conclusion that her criminal history category did not overrepresent her criminal history. ECF No. 126 at PageID #: 760.

Of even greater concern is Defendant's lack of preparedness to lead a law-abiding life.[18] Release is not a panacea. Defendant committed crimes to maintain a lifestyle. *See* Tr. of Sent'g Proc., ECF No. 126 at PageID #: 744–45. Once released, she will be under a term of supervised release and compliance requires that she be able to live a law-abiding lifestyle—one that is

---

[18] The undersigned is well-aware "that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a).

13

(1:13CR467-1)

foreign to her history.  She asks that she be released to continue her gender affirmation process, without any explanation of how resources for that process would be legitimately obtained.  *See* ECF No. 309 at PageID #: 1863.  In the alternative, she asks "that the Court recommend that she be placed in a BOP Residential Reentry Center compatible with transgender living in accordance with the Women and Special Populations Branch of the BOP."  ECF No. 309 at PageID #1863.

Because Defendant "has not yet had a penectomy and vaginoplasty," when released, the Bureau of Prisons will likely house her in a male residential reentry center.[19]  Without BOP resources and no apparent independent housing options, Defendant will either be homeless or forced to reside in a homeless shelter.  Neither will provide her the treatment she desires or encourage the law-abidingness her conditions of supervised release require.  Defendant's placement in a residential reentry center will assist Defendant in transitioning into the community and equip her with stability and skills that should minimize her risk of recidivism.

3.  *Need for the Sentence Imposed*

Defendant's crimes were fueled by her lack of legitimate resources and her desire to complete her transition.[20]  It appears that not much has changed.  She has not presented evidence of job skills attained or opportunities for employment post-release.[21]  This lack of concrete or even aspirational steps taken by Defendant to ensure that she can become employed or

---

[19] Since Executive Order 14168 went into effect on January 30, 2025, the BOP is required to house transgender inmates in facilities that align with sex at birth, regardless of their gender identity.  This mandate applies to prisons and residential reentry centers.  Exec. Order No. 14168, Sec. 4(a), 90 Fed. Reg. 8615, 8616–8617 (Jan. 30, 2025).

[20] *See* Tr. of Sent'g Proc., ECF No. 126 at PageID ##: 726, 729–30 ("The incentive in this case to commit the crimes was so she could make enough money to have surgery to become a female.").

[21] Prior to her incarceration, Defendant had completed some college, studied radio and television broadcasting, but expressed a desire to return to college and pursue a career in the medical field.  ECF No. 104 *SEALED* at PageID #: 598.

14

(1:13CR467-1)

legitimately self-sustaining is concerning.[22] This void is punctuated by her disciplinary record, which is evidence that throughout her term of incarceration she has lived in general population with others, not isolated and unable to participate in programming.

Defendant has written voluminously to the Court about her desire to be released. She is remarkably silent, however, about how she will live outside of prison. In other words, Defendant does not reveal how she plans to lead a law-abiding life if released early.[23] Defendant is now 40 years old and, based on the record before the Court and as noted above, still has no legitimate work history or job-ready skills. Despite ten years in custody, she concedes that she has not completed programs that would provide her with marketable job skills.[24] She has not shown a commitment to developing the knowledge, skills, or experience needed to find and maintain employment outside of prison. The transcript submitted is remarkable for its lack of courses showing job readiness including, for example, interviewing, resume writing, or other employment related pursuits. *Compare with* United States v. Morton, Case No. 1995 FEL 002394, 2022 D.C. Super. LEXIS 56, at *30 (D.C. Super. Ct., Nov. 23, 2022) (noting Morton's

---

[22] While other resources may be available, the Executive Order also mandates that "no Federal funds [can be] expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." Exec. Order No. 14168, Sec. 4(c), 90 Fed. Reg. 8615, 8616–8617 (Jan. 30, 2025).

[23] A motion made by Defendant July 13, 2020 stated that, if released early, Defendant would reside with her sister who could provide housing and financial support while Defendant receives medical treatment and completes her transition. ECF No. 193 at PageID #: 1226. This plan is not reiterated in the July 3, 2024 motion, causing the Court to doubt its viability. Even if that plan were still viable, it does not explain how Defendant would financially support herself or how she plans to live as a contributing member of society.

[24] *See* ECF No. 266 at PageID #: 1601 (retorting to Government's argument that she has not offered sufficient evidence of education and training with "[h]ow can Nash safely participate in education and training courses if she is being repeatedly raped by inmates and staff[?]" and "[w]hen safe to do so, Nash has participated in recidivism reduction classes."). *See also* Ex. E, ECF No. 266-5 (education data transcript).

(1:13CR467-1)

"significant steps to [prepare] herself" through prison education programs, courses on job readiness, apprenticeship-level programs, and certificates). The within motion also provides no insight on where (independent of the BOP) Defendant plans to live once she is released, other than that she intends to receive immediate medical and psychological treatment and continue her gender affirmation process. See Mot. for Compassionate Release, ECF No. 309 at PageID #: 1862. This is particularly concerning because residential stability is a pillar of law-abidingness.

That Defendant owes a significant restitution balance makes her lack of planning and forecasted post-release instability even more concerning.[25] As discussed above, given the lingering effects fraud has on its victims, it would "not be fair" nor respectful to the law to release Defendant "as compensation for prison's failure to protect [her] from harm while in prison." See United States v. Brice, Criminal Action No. 13-cr-206-2, 2022 WL 17721031, at *6 (E.D. Pa. Dec. 15, 2022) (finding that Brice's "suffering" cannot be considered in isolation).

At bottom, the Court struggles to see any effort made by Defendant to lessen the likelihood that she will not recidivate and pose a danger to the community. As indicated earlier, when sentenced, Defendant had no employment history, no assets, no monthly income, and significant liabilities due to medical bills. See Presentence Report, ECF No. 104 *SEALED* at PageID #: 598. Defendant was transitory and in and out of jail for much of her life. ECF No. 104 *SEALED* at PageID #: 597–98 (reporting that Defendant was unable to complete sex transition due to "being in and out of jail for much of [her] life," and her residence was a hotel

---

[25] Restitution remains viable until the later of 20 years from date of judgment or 20 years after release from incarceration. See 18 U.S.C. § 3613(b). See also, Criminal J., ECF No. 114 at PageID #: 699 (listing $137,513 for California, $101,643 for North Carolina, $96,592 for Ohio, $15,957 for Texas, $7,296 for Kansas, and $2,340 for Indiana for a total of $361,341 in restitution ordered).

16

(1:13CR467-1)

for six to eight months, and a rented house for two months before that).  Defendant also stated that her lack of employment history was because she couldn't get hired because she "[had] no experience or [experienced] gender discrimination." [26]  ECF No. 104 *SEALED* at PageID #: 598.  The Court notes, however, that Defendant's long criminal history of fraud and theft likely also contributed to her lack of employment history.  ECF No. 104 *SEALED* at PageID ##: 586–94, ¶¶ 43, 44, 45, 47, 48, 50, 51, 53, 54, 55, 58 (listing various criminal history counts related to fraud, theft, or receipt of stolen property).  All of this points to a lack of preparedness to reenter as a productive member of society.  It is this lack of preparedness coupled with hope for Defendant's post-release success that motivates the Court to modify the sentence to recommend the Bureau of Prisons consider placing Defendant in a halfway house for the maximum term before her release.

    4.  *Deterrence—General and Specific is a Necessity*.

The Sixth Circuit has acknowledged that white collar crime is "especially susceptible to general deterrence" as "economic and fraud-based crimes are more rational, cool, and calculated."[27]  *United State v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014).  Deterrence is key to Defendant's successful reentry to society.

---

[26] Transgender women actresses like Laverne Cox, to name only one successfully employed transgender woman, may object to this generalization.  *See e.g.* Laverne Cox, https://lavernecox.com/ (last visited Aug. 15, 2025); Corporate Equality Index 2025, HUMAN RIGHTS CAMPAIGN, https://reports.hrc.org/corporate-equality-index-2025 (last visited Aug. 15, 2025).  *But see* Brad Sears, Christy Mallory, Andy Lin, & Neko Michelle Castleberry, *Workplace Experiences of Transgender Employees*, UCLA SCHOOL OF LAW, WILLIAMS INSTITUTE, https://williamsinstitute.law.ucla.edu/publications/transgender-workplace-discrim/ (Nov. 2024).

[27] *See also* Tr. of Sent'g Proc., ECF No. 126 at PageID #: 722 ("[Defense counsel] think[s] the crime itself shows some level of sophistication intellectually, and [ ] think[s] it reflects [Defendant's] ability intellectually.").

(1:13CR467-1)

While the number of Defendant's disciplinary incidents has decreased from the early years of her incarceration, she continues to exhibit noncompliance with the rules. This forecasts a lack of respect for the law. *See* Resp. in Opp'n, ECF No. 318 at PageID ##: 1896–98. The Court accepts that prisons are difficult environments and that is especially so for a transgender inmate.[28] But, as written above, early release will likely mean Defendant leaving one BOP facility for another with similar rules for managing its transgender population.[29] Defendant's lack of a plan for how she will support herself and reside once back in society, augurs a likelihood that Defendant will resort to her previous criminal behavior and, therefore, pose a danger to the community.

5. *Sentencing Disparity*

The Sixth Circuit has ruled that "[o]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Peppel*, 707 F.3d 627, 638–39 (6th Cir. 2013) (citing *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008)). The disparity between Defendant's sentence and those of her co-defendants was warranted. The co-defendants received sentences of 30 months, 37 months, and 74 months. Their shorter sentences were because (1) their roles were "significantly less than that of [Defendant]," and (2) all the co-defendants received further reduction under section 5K1.1. *See* Tr. of Sent'g Proc., ECF No. 126 at PageID #: 745. The sentencing court also noted that even

---

[28] *See* Reply, ECF No. 322 at PageID #: 2313 ("[Defendant] respectfully submits that her disciplinary issues in prison are not rooted in any disrespect of authority or inability to conform her behavior to the rules[;] her violations are evidence of her trying to survive as a transgender female housed in a male federal prison.").

[29] It would also be unrealistic for Defendant not to anticipate that she would have to continue interacting with male authority figures, post-release.

18

(1:13CR467-1)

though the co-defendants were similar as to the total offense level, they were different as to the criminal history category and the 5K1.1 departures. ECF No. 126 at PageID #: 756.

Defendant's claim that she cooperated rings hollow. Her admission of guilt undoubtedly conserved prosecutorial and judicial resources, but a reduction for substantial assistance does not apply unless the Government moves for it and the Court agrees, as it did for her co-defendants.[30] Ultimately, Defendant's offense level and criminal history resulted in a Guidelines range longer than that of her co-defendants.[31] Defendant had a Guidelines range of 151 to 188 months---she received a sentence of 151 months for Counts One through Thirty-One to be served concurrently to 120 months on Count Thirty-Three; and consecutively to 24 months for Count Thirty-two, as required by statute. Sentencing disparity does not warrant a sentence reduction.

### IV. Conclusion

Taking into consideration all appropriate § 3553(a) factors, the Court finds that sentence reduction would undermine the seriousness of Defendant's crimes, put the public at unnecessary risk, and fail to deter Defendant's future criminal acts. Defendant's circumstances, or the

---

[30] It is worth noting that Defendant rejected a plea agreement which would have suggested a shorter term of incarceration and made her eligible for a substantial assistance reduction. *See* Tr. of Sent'g Proc., ECF No. 126 at PageID #: 750 ("[Defendant] rejected a plea agreement that would have given her much less [time] and given her 5K credit.").

[31] The Court also notes that according to national statistics gathered by the U.S.S.G. in 2024, reasons a sentence could be increased included "sophisticated means to execute or conceal the offense," "using an unauthorized means of identification," "a leadership or supervisory role," and "number of victims or extent of harm to victims." *See* THEFT, PROPERTY DESTRUCTION & FRAUD, U.S. SENT'G COMM'N, https://www.ussc.gov/research/quick-facts/theft-property-destruction-fraud (last visited Aug. 1, 2025). The U.S.S.G. also noted that 41.4% of sentences for theft, property destruction and fraud were within the Guideline range and 74.2% were sentenced to prison. Defendant's offenses included the various increase reasonings that the U.S.S.G. noted and Defendant's sentence was within the Guidelines range. The Court also notes that 73.0% of defendants "had little or no prior criminal history" which was not the case for Defendant. *Id.*

19

(1:13CR467-1)

combination of her circumstances, does not override the factors that encourage the Court to maintain the length of the sentence imposed.

  The Court does, however, modify the sentence in two ways.  First, the Judgment is modified to recommend that the Bureau of Prisons allows Defendant the maximum term of halfway house placement allowed pursuant to the Second Chance Act or other available funding.  The Court also modifies her three-year term of supervised release to include a six to nine months stay at a residential reentry center that can assist Defendant with obtaining and maintaining employment and provide stable housing upon her release.

  For the reasons above, Defendant's motion for sentence reduction (ECF No. 309) is denied.

  IT IS SO ORDERED.

| August 15, 2025 | /s/ Benita Y. Pearson |
|---|---|
| Date | Benita Y. Pearson<br>United States District Judge |